United States Court of Appeals,

Fifth Circuit.

No. 95-60786.

In the Matter of Larson C. LOCKLIN, Debtor.

Jacob C. PONGETTI, Trustee for the Estate of Larson Locklin, Appellant,

v.

GENERAL MOTORS ACCEPTANCE CORPORATION, Appellee.

Dec. 16, 1996.

Appeal from the United States District Court for the Northern District of Mississippi.

Before POLITZ, Chief Judge, and EMILIO M. GARZA and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Plaintiff Jacob C. Pongetti, the trustee of the estate of Larson C. Locklin, appeals the district court's order affirming the bankruptcy court's dismissal of his complaint requesting the court to avoid defendant General Motors Acceptance Corporation's purchase money security interest in a vehicle purchased by Locklin and to declare the vehicle the property of Locklin's estate. We reverse.

I

On May 4, 1990, Larson C. Locklin, apparently an Alabama resident, bought a new 1990 GMC Safari Van from Mitchell Buick, Pontiac, GMC Truck, Inc. ("Mitchell Buick"), a dealer in Mississippi. He agreed to pay $18,300 for the van, plus a finance charge of $4,945.44, for a total of $23,245.44, payable in

1

forty-nine equal monthly installments. Locklin and Mitchell Buick executed a retail installment contract, granting the dealer a purchase money security interest in the van. Mitchell Buick then assigned the contract and security interest to General Motors Acceptance Corporation ("GMAC").

The same day, Locklin took possession of the van from Mitchell Buick, and also received a number of documents, including the manufacturer's certificate of origin, which is necessary to obtain a certificate of title in Alabama. On May 9, Locklin applied for an Alabama certificate of title with the Tuscaloosa license commissioner ("the commissioner") in Tuscaloosa, Alabama. On May 18, the commissioner prepared a titled remittance advance and mailed it, along with various required documents, to the Alabama Department of Revenue ("the department") in Montgomery, Alabama. The department received these documents on May 21, seventeen days after Locklin bought and received the van. More than two weeks later, the department issued a certificate of title showing Locklin as owner and GMAC as lienholder.

On May 23, two days after the department received the documents, Locklin, asserting that he was a Mississippi resident, filed a Chapter 7 petition for bankruptcy in the United States Bankruptcy Court for the Northern District of Mississippi. Jacob C. Pongetti, the trustee for Locklin's estate, filed a complaint against GMAC in bankruptcy court requesting the court to avoid GMAC's security interest in the van, and declare the van the

property of Locklin's estate. The trustee asserted that the court must avoid the lien because it was not "perfected on or before 10 days after the debtor receives possession of such property...." 11 U.S.C. § 547(c)(3)(B). The bankruptcy court rejected this argument, ruling that GMAC perfected its security interest under § 32-8-61 of the Alabama Code when Locklin delivered the required documents to the local license commissioner five days after he received possession of the van. The district court affirmed.

On appeal, the trustee contends that the district court erred by refusing to apply the plain meaning of the phrase "delivery to the department" in § 32-8-61. In reply, GMAC asserts that the district court was correct, but also suggests two alternative grounds for upholding the court's judgment. First, GMAC contends that the twenty-day grace period set forth in § 32-8-61 preempts the ten-day period provided by § 547(c)(3)(B), and that the trustee cannot avoid the security interest because the required documents were delivered to the department itself in seventeen days. Second, GMAC maintains that the trustee cannot avoid the security interest because it can shelter the property under the contemporaneous exchange exception in § 547(c)(1).

II

We review findings of fact for clear error and legal conclusions *de novo. McFarland v. Leyh (In re Texas Gen. Petroleum Corp.),* 52 F.3d 1330, 1334 (5th Cir.1995). When the district court

3

has affirmed the bankruptcy court's findings of fact, our review for clear error is strict. *Young v. National Union Fire Ins. Co. (In re Young),* 995 F.2d 547, 548 (5th Cir.1993). Moreover, we review determinations of state law *de novo. See Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (holding that a court of appeals should review a district court's determination of state law *de novo); Lindsay v. Beneficial Reins. Co. (In re Lindsay),* 59 F.3d 942, 949 (9th Cir.1995) (holding the same with regard to determinations of state law by both district court and bankruptcy court), *cert. denied,* --- U.S. ----, 116 S.Ct. 778, 133 L.Ed.2d 730 (1996).

III

The trustee argues that the district court misconstrued the phrase "delivery to the department" in § 32-8-61 as meaning *either* delivery to the department itself or delivery to a designated agent of the department, rather than *just* delivery to the department itself.

A trustee can avoid a purchase money security interest (also called an enabling loan) if it can show that this security interest does not meet one of the requirements of § 547(c)(3). The parties do not dispute that the security interest here meets the four requirements of § 547(c)(3)(A).[1] Rather, they disagree whether the

---

[1]This provision states that a purchase money security interest must

4

security interest satisfies the demand in § 547(c)(3)(B) that it "[be] perfected on or before 10 days after the debtor receives possession of such property."

To determine if the security interest is perfected, we turn to state law.[2] *Palmer v. Radio Corp. of Am.,* 453 F.2d 1133, 1138 (5th Cir.1971). Section 32-8-61 of the Alabama Code provides:

> (a) Unless excepted by this section, a security interest in a vehicle for which a certificate of title is required by the terms of this chapter is not valid against creditors of the owner or subsequent transferees or lienholders of the vehicle unless perfected as provided in this article.

> (b) A security interest is perfected by the delivery to the department of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee. It is perfected as of the time of its creation if the delivery is completed within 20 days thereafter, otherwise, as of the time of the delivery.

The district court first determined that the ten-day grace period mandated by 11 U.S.C. § 547(c)(3)(B) preempts the twenty-day grace

---

secure[ ] new value that was—

> (i) given at or after the signing of a security agreement that contains a description of such property as collateral;

> (ii) given by or on behalf of the secured party under such agreement;

> (iii) given to enable the debtor to acquire such property; and

> (iv) in fact used by the debtor to acquire such property....

[2]Both of the parties assume Alabama, rather than Mississippi, law applies here.

period set forth in § 32-8-61.  However, it then decided that the security interest was perfected five days after Locklin took possession of the van when he delivered the required documents to the commissioner, and that thus the trustee could not avoid it. The court reasoned that the commissioner had "apparent authority to accept the documents for the ultimate purpose of perfecting a security interest" because § 32-8-34 made county commissioners of licenses "designated agents" of the department and because the commissioner "held himself out as an official involved in both licensing and perfection."  The court also noted that it did not think that the Alabama legislature intended to "punish a party acting in good faith for the transgressions of a negligent public officer."

As an initial matter, we determine that the district court's finding that the commissioner "held himself out as an official involved in ... perfection" is clearly erroneous.  The bankruptcy court never made such a finding, and there is nothing in the record that supports it.

Next, we determine whether the district court erred in its legal analysis.  While several cases applying Alabama law touch on § 32-8-66, none applies it in the specific context presented by this case.  The Alabama Supreme Court, though, has implied that it believes that courts should be especially careful not to "tinker" with the statute that contains this provision, the Alabama Uniform Certificate of Title and Antitheft Act ("the act" or "the

6

statute"), ALA.CODE § 32-8-1 *et seq.* In *Hill v. McGee,* 562 So.2d 238 (Ala.1990), the plaintiff argued that his security interest in certain trucks was perfected by the filing of a UCC-1 financing statement with the Alabama secretary of state. The Alabama Supreme Court rejected this contention, and held that the statute provides the "exclusive method of perfecting a security interest in a motor vehicle covered by the Act...." *Id.* at 240. The court approvingly quoted the state circuit court as stating

> [a]n attempt to do "justice at the palace gate" by carving out one or more exceptions to the exclusive procedures set forth in the certificate of title act will have some appeal in a given case; however, the proliferation of such exceptions by the courts of this state could lead to chaos in the marketplace which existed prior to 1973. Such tinkering would be harmful and confusing to consumers, lenders and dealers alike.

*Id.* Thus, we must turn to the interpretation of words of § 32-8-66 themselves.

"The starting point in every case involving a construction of a statute is the language itself." *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). However, statutory language must always be read in its proper context. *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991). In determining the plain meaning of a statute, the court must "look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990).

7

Section 32-8-61(b) refers to "delivery to the department." Section 32-8-2—entitled "[d]efinitions"—defines "department" as "[t]he department of revenue of this state."

In terms of design, the act has four articles, two of which pertain here. Article 3 deals with security interests, and contains the language at issue here in § 32-8-61. Article 2 pertains to certificates of title, and includes the language to which the district court referred in interpreting § 32-8-61. In Article 2, for instance, § 32-8-34(a) provides that "[e]ach judge of probate, commissioner of licenses, director of revenue or other county official in this state authorized and required by law to issue motor vehicle license tags shall by virtue of his office be a designated agent of the department." Section 32-8-34(b) also adds certain dealers as designated agents. Section 32-8-35(a) then requires a vehicle's owner to apply for the first certificate of title to a "designated agent, on the form the department prescribes...." If the application is for a vehicle bought from a dealer, it must include the "name and address of any lienholder holding a security interest created or reserved at the time of the sale and the date of his security agreement" and "the designated agent shall promptly mail or deliver the application to the department." ALA.CODE § 32-8-35(b). Section 32-8-35(g) provides that "[e]very designated agent within this state shall, no later than the next business day after an application is received by him, forward the same to the department by mail, postage prepaid, with

8

such other evidence of title as may have been delivered to him by the applicant, along with the required fee...."

Our examination of the statutory plan makes clear that the district court erred in defining "department" as including "designated agents." First, the statutory definition of "department" only refers to the department itself, not the department's agents. We note that the model act upon which the statute is based includes an optional definition for department which includes local officials authorized by the department to receive documents on their behalf.[3] The Alabama legislature rejected this optional definition. In addition, in the general title governing motor vehicles and traffic, "department" is defined as "[t]he department of public safety of this state acting directly or through its duly authorized officers and agents." ALA.CODE § 32-1-1.1. If the legislature intended "department" in chapter 8 of title 32 to include designated agents, then one would expect that it would have said so, just as it did in chapter 1 of that title.

---

[3]*See* Unif. Motor Veh. Cert. of Title & Anti-Theft Act ("Uniform Act") Refs. & Annos. (noting that Alabama adopted a version of the act in 1973); Unif. Motor Veh. Cert. of Title & Anti-Theft Act § 1 ("[Definitions] ... "Department' means the [Department of Motor Vehicles] of this state. [The term includes a [County Clerk] when authorized by the Department to receive a document [or article] on its behalf.].") (the bracketed terms are the optional ones).

Moreover, § 32-8-61(b) is a virtually verbatim restatement of § 20(b) of the Uniform Act. Both provisions contain this sentence: "A security interest is perfected by the delivery to the department of the existing certificate of title...."

*Cf. West Virginia Univ. Hosps. v. Casey,* 499 U.S. 83, 91, 111 S.Ct. 1138, 1143, 113 L.Ed.2d 68 (1991) (stating that if petitioner's argument that reference to "attorney's fee" in statute also included "expert fees," then "dozens of statutes referring to the two separately become an inexplicable exercise in redundancy").

Second, there is no reference to designated agents in this provision nor anywhere else in Article 3. Had the legislature intended designated agents to pay a role in the perfection of security interests—as they do in forwarding applications for certificates of title—we would assume that the legislature at least would have *mentioned* such agents in Article 3. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972)).

Third, we do not think that the fact that Article 2 alludes to designated agents means that they can be imported into Article 3. The designated agents discussed in Article 2 merely issue motor vehicle license tags and pass on first certificates of title to the department after collecting the required fee and verifying certain information about the vehicle and the applicant. Section 32-8-34 refers to designated agents as those "authorized and required by

law to issue motor vehicle license tags...." It says nothing about perfection. Moreover, § 32-8-35 lists the few ministerial responsibilities of designated agents pertaining to first certificates of title; none of these duties refers to perfection.[4]

Other courts have held similarly under comparable statutes. In *Waldschmidt v. Miracle Motors (In re Haynes),* 28 B.R. 136 (Bankr.M.D.Tenn.1983), for instance, Miracle Motors alleged that, under a Tennessee statute analogous to the Alabama one here, the county clerk was an "agent" for the Motor Vehicle Division, and thus Miracle Motors' security interest was perfected when the county clerk received the title application. Pointing to a provision which listed the county clerks' duties as including "receiving and forwarding to the division each application for certificates of title," the court rejected Miracle Motors' argument. It noted that

> [a]lthough the clerks are empowered to receive applications, they are merely conduits to the Motor Vehicle Division. Perfection dates only from the date of receipt and filing by the Motor Vehicle Division. The county clerk's responsibility is statutorily limited to that of registrar. The responsibility of filing and indexing liens is the exclusive province of the Motor Vehicle Division.

---

[4]Designated agents receive applications for first certificates of title from vehicle owners. ALA.CODE § 32-8-35(a), (g). They certify that they have physically inspected the applicant's vehicle, that the vehicle identification number and descriptive data shown on the application are correct, and that they have identified the person signing the application and witnessed the signature. *Id.* § 32-8-35(d). They collect the required fee from the owner, and send the completed application and fee to the department. *Id.* § 32-8-35(g).

11

*Id.* at 138 n. 8. In *Exchange Bank of Polk County v. Christian (In re Christian),* 8 B.R. 816, 818 (Bankr.M.D.Fla.1981), a bank delivered to a tag agency an application for a title certificate together with the required lien documents. It then argued that the tag agency was the agent of the Department of Motor Vehicles, and thus filing with the tag agency was tantamount to filing with the department itself. The court rejected this argument, noting that the tag agency had "limited responsibilities such as processing applications for title certificates for motor vehicles, but these responsibilities did not include the power to record liens or issue title certificates." *Id.*

Fourth, if we read "department" in Article 3 as *including* designated agents, then presumably we would have to read the various provisions in Article 2 the same way (because both share the same statutory definition of "department"). This would lead to absurd results in Article 2; for instance, under § 32-8-35(g), a designated agent would be required to forward a certificate of title application to himself. We must, therefore, reject such a reading. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.").

At the same time, the objects and policies behind the statute show that, with regard to perfecting security interests, the

12

legislature did not intend "department" to mean "the department itself or its designated agents."  The overall plan of the act shows exclusive attention to maintaining records of the identity and ownership of vehicles.  *Johnny Spradlin Auto Parts, Inc. v. Cochran,* 568 So.2d 738, 743 (Ala.1990).  Also, the statute enables interested parties to find out information about vehicles,[5] *id.,* and ensures that the department notes the lien on the certificate of title.  *Lightfoot v. Harris Trust & Savs. Bank,* 357 So.2d 654, 657 (Ala.1978).  Filing the documents required for perfection at the department itself rather than with a designated agent better realizes these objects and policies.  Such filing encourages more rapid centralized recordkeeping.

Lastly, we note that at least two courts have interpreted a Georgia statute very similar to the Alabama one at issue here (the Georgia law required "delivery to the commissioner" rather than "the department") and reached the same conclusion we do.  In *Harris v. General Motors Acceptance Corp. (In re Messer),* 1991 WL 629467 (Bankr.M.D.Ga.1991), the required perfection documents were delivered to the county tax commissioner within the twenty-day grace period but were not delivered to the state revenue

---

[5]One court has noted that "[i]t is commercially absurd for a purchaser or creditor to direct inquiries to all county clerks in the state to elicit information concerning a possible outstanding lien.  If a prospective purchaser or potential creditor is to determine whether or not a particular motor vehicle is encumbered, the only source of reliable information is the Motor Vehicle Division in Nashville."  *Haynes,* 28 B.R. at 139.

13

commissioner within that period.  GMAC argued that, because the county tax commissioner was an agent of the state revenue commissioner, delivery to the former was the equivalent of delivery to the latter.  The court rejected this contention.  It observed that the Georgia legislature had only drafted the statute to require delivery to the commissioner and that, while the legislature could have mandated delivery to the commissioner or his agents, it had chosen not to do so.

Likewise, in *Perkins v. Gilbert (In re Perkins),* 169 B.R. 455 (Bankr.M.D.Ga.1994), the secured party delivered the documents necessary to perfect his security interest to the county tag agent rather than the commissioner.  The delivery to the tag agent occurred within the twenty-day grace period and actual delivery to the commissioner outside that period.  Accordingly, the court held that the security interest was not perfected during the grace period.[6]

---

[6]The *Perkins* court noted that, in 1994, the Georgia legislature amended the statute in question to state that the legislature originally intended to provide that delivery of the required documents to either the commissioner or a county tag agent was sufficient to perfect the security interest.  In other words, the legislature did not change the language of the statute, but rather "amended" its legislative history.

While the 1994 amendment did not apply to the instant case, the court suggested that some future court interpreting the statute would need to determine whether the legislative history of a statute must be contemporaneous with its enactment, and opined that the Supreme Court has given "somewhat contradictory guidance" on this question. *Perkins,* 169 B.R. at 461 n. 7.

14

Therefore, we find that the district court erred in finding that "delivery to the department" under § 32-8-61 included delivery to the commissioner.

IV

We now consider GMAC's first alternative ground for upholding the district court. *See J.E. Riley Inv. Co. v. Commissioner of Internal Revenue,* 311 U.S. 55, 59, 61 S.Ct. 95, 97, 85 L.Ed. 36 (1940) ("Where the decision below is correct it must be affirmed by the appellate court though the lower tribunal gave a wrong reason for its action."); *Bickford v. International Speedway Corp.,* 654 F.2d 1028, 1031 (5th Cir. Unit B 1981) ("[R]eversal is inappropriate if the ruling of the district court can be affirmed on any grounds, regardless of whether those grounds were used by the district court."). GMAC maintains that the twenty-day grace period set forth in § 32-8-61 preempts the ten-day period provided by § 547(c)(3)(B), and that the trustee cannot avoid the security interest because the required documents were delivered to the department itself after seventeen days.

We squarely addressed this issue in *Howard Thornton Ford, Inc. v. Fitzpatrick (In re Hamilton),* 892 F.2d 1230 (5th Cir.1990), and held that the ten-day grace period of § 547(c)(3)(B) prevailed over

GMAC suggests that this 1994 amendment bolsters its interpretation of the Alabama statute at issue here. However, in the absence of any similar action by the Alabama legislature amending § 32-8-61 (or its legislative history), we find this contention without merit.

15

a twenty-day grace period under state law.[7]  We believe that Congress intended the ten-day grace period for perfection in § 547(c)(3)(B) to provide uniformity, and that it did not mean for state grace periods to be relevant under the statute.[8] *Long v. Joe Romania Chevrolet, Inc. (In re Loken),* 156 B.R. 660, 663 (Bankr.D.Ore.1993); *Jahn v. First Tenn. Bank of Chattanooga (In re Burnette),* 14 B.R. 795, 797-02 (Bankr.E.D.Tenn.1981);  *see also* U.S. CONST. art. I, § 8, cl. 4 (granting Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States").  Thus, we reaffirm our holding in *Hamilton,* and determine that the ten-day federal grace period trumps the twenty-day Alabama grace period.

V

---

[7]The federal circuit courts are split on this issue.  The Ninth Circuit has recently agreed with us.  *Fitzgerald v. First Security Bank of Idaho, N.A. (In re Walker),* 77 F.3d 322, 322 (9th Cir.1996).  The Tenth and Eleventh Circuits have disagreed.  *Webb v. GMAC (In re Hesser),* 984 F.2d 345, 348 (10th Cir.1993); *GMAC v. Busenlehner (In re Busenlehner),* 918 F.2d 928, 929 (11th Cir.1990), *cert. denied,* 500 U.S. 949, 111 S.Ct. 2251, 114 L.Ed.2d 492 (1991).

[8]We also note that, in 1994, Congress amended § 547(c)(3)(B) to provide a grace period of 20 days rather than 10 (this amendment is effective in cases commenced on or after October 22, 1994). Congress intended this amendment to conform bankruptcy practice to the practice in most states of allowing purchase-money security lenders 20 days to perfect their security interest.  4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 547.11 (citing Section by Section Description of H.R. 5116, 140 Cong.Rec. H10767 (daily ed. Oct. 4, 1994)).  It is difficult to see why Congress would have passed this amendment if it did not believe that the federal grace period in § 547(c)(3)(B) prevails over conflicting state-law grace periods.

Next, GMAC claims that the trustee cannot avoid the security interest because the contemporaneous exchange exception in § 547(c)(1) applies.  Section 547(c)(1) provides:

> (c) The trustee may not avoid under this section a transfer—
>
> > (1) to the extent that such transfer was—
> >
> > > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor;  and
> > >
> > > (B) in fact a substantially contemporaneous exchange....

GMAC claims that the Locklin and GMAC intended their exchange to be contemporaneous.   It also asserts that the exchange was substantially contemporaneous even if it occurred outside of the ten-day grace period because this delay can be attributed to the commissioner, not any party.

While § 547(c)(1) deals generally with security interests, § 547(c)(3) applies specifically to purchase money security interests.  The question arises, then, whether a purchase money security lender, such as GMAC, which meets all the requirements of the § 547(c)(3) exception save the ten-day perfection mandate, can alternatively shelter under the § 547(c)(1) exception.

This is an issue of first impression in this circuit.  We note, however, that all the circuit courts that have considered this matter have held that a purchase money security lender may only shelter under § 547(c)(3), not (c)(1).  *Wachovia Bank & Trust*

17

*Co. v. Bringle (In re Holder),* 892 F.2d 29, 31 (4th Cir.1989);

*Erie v. Baker (In re Tressler),* 771 F.2d 791, 794 (3d Cir.1985);

*Gower v. Ford Motor Credit Co. (In re Davis),* 734 F.2d 604, 607

(11th Cir.1984); *Valley Bank v. Vance (In re Vance),* 721 F.2d 259,

262 (9th Cir.1983).[9]  We join these circuits, and hold that a

purchase money security lender may not shelter under § 547(c)(1).

Such a determination best accords with the legislative intent and

the policies underlying the enactment of § 547(c);  it is also

required by the principles of statutory interpretation.

---

[9]We must distinguish carefully here between cases involving purchase money security interests and nonpurchase money security interests.  In the former, circuit courts have uniformly ruled that lenders who failed to perfect within 10 days may not take advantage of the § 547(c)(1) exception.  In the latter, circuit courts have split.  One court has suggested that, where a lender does not perfect within 10 days, the lender cannot shelter under § 547(c)(1). *See Ray v. Security Mut. Fin. Corp. (In re Arnett),* 731 F.2d 358, 364 (6th Cir.1984) ("The applicability of section 547(c)(1) to delayed perfection of security interests is ... limited to 10 days.").  Another has adopted a more flexible standard. *See Pine Top Ins. Co. v. Bank of America Nat'l Trust and Savs. Ass'n,* 969 F.2d 321, 328 (7th Cir.1992) (noting that "the modifier "substantial' makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances (e.g., length of delay, reason for delay, nature of the transaction, intentions of the parties, possible risk of fraud) surrounding the allegedly preferential transfer"); *see also Dye v. Rivera (In re Marino),* 193 B.R. 907, 915 (9th Cir. BAP 1996) (same).

Unfortunately, some courts have blurred the distinction between the nature of the security interests in *Holder, Tressler, Davis,* and *Vance* and those in *Arnett* and *Pine Top. See, e.g., Kepler v. Security Pac. Housing Servs. (In re McLaughlin),* 183 B.R. 171 (Bankr.W.D.Wis.1995) (contrasting *Pine Top* with *Tressler, Davis, Vance,* and *Arnett,* and, on this basis, suggesting a split between the Seventh Circuit and the Third, Sixth, Ninth, and Eleventh Circuits).

First, while § 547(c)(3) makes clear that it applies to credit transactions involving purchase money security interests, § 547(c)(1) does not state whether it pertains to such interests. The legislative history of § 547(c)(1), though, suggests that it does not apply to enabling loans. This history reveals that Congress enacted the provision to ensure that purchases by check would not be avoided as preferential.[10] S.Rep. No. 989, 95th Cong., 2d Sess. 88, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5874; H.Rep. No. 595, 95th Cong., 2d Sess. 373, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329. Second, the main policy behind the ten-day grace period was to create a uniform perfection period for enabling loans. *Davis,* 734 F.2d at 607. Permitting a purchase money security lender to prevent avoidance after failing to perfect its interest within this period would defeat this policy. Third, reading § 547(c)(1) as sheltering enabling loans would render § 547(c)(3)(B) virtually meaningless. Such an interpretation would require a court to examine under § 547(c)(1) every enabling loan that did not qualify for protection under § 547(c)(3). As a practical matter, this would turn the ten-day grace period into "little more than an

---

[10]Congress was concerned that a transfer involving a straightforward payment by check might be avoided under § 547(b)(2) as being "for or on account of an antecedent debt." Technically speaking, a payment by check is a credit transaction; the seller does not receive payment until the check is cleared through the debtor's bank. Under § 547(c)(1), though, a transfer involving a check—assuming the check is promptly deposited and cleared—will be substantially contemporaneous, and thus may not be avoided.

evidentiary presumption." *Id.* Such a strained construction of the statute is untenable. *See Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307-08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961) (noting that we may not adopt a forced reading of a statute that renders one part a mere redundancy). Fourth, given the fact that Congress provided a specific exception in § 547 governing enabling loans, we do not think—at least in the absence of any evidence to the contrary—that it intended another exception in the section to also apply to such loans. *Expressio unius est exclusio alterius.*

VI

For the foregoing reasons, we REVERSE the judgment of the district court.